**B & H INVESTMENT CO., et al., Respondents,**

v.

**UNION STOCKYARDS COMPANY OF FARGO, Appellant.**

No. C8–93–1591.

Court of Appeals of Minnesota.

March 15, 1994.

Review Denied May 17, 1994.

Frank R. Berman, Sandra K. Kensy, Frank R. Berman, P.A., Minneapolis, for respondents.

J. Patrick McDavitt, Janel E. LaBoda, Briggs and Morgan, P.A., Minneapolis, for appellant.

Considered and decided by PARKER, P.J., and HUSPENI and FOLEY, JJ.

## OPINION

FOLEY,* Judge.

In this case arising out of the lease agreement between a stockyard and a meat packing plant, appellant alleges the trial court misinterpreted the lease, improperly instructed the jury, and erred when it denied JNOV or a new trial. In a notice of review, respondents contend that the trial court erred in its award of prejudgment interest. The lease agreement, which was clear and unambiguous on its face, precluded any claim for breach of implied contract. That lease contained no provision obligating appellants to provide a specific amount of cattle to respondents. We reverse and remand for entry of judgment notwithstanding the verdict.

## FACTS

This action arises out of the interpretation of a lease that governs the relationship between a stockyard and the meat processing plant located adjacent to the stockyard in Cass County, North Dakota. The meat processing plant is located on land leased from appellant Union Stockyards Company of Fargo (Union). The lease underlying this action originated in 1978 between Union and Paul Schanno. This lease provides that the lessee may assign his interest in the lease without the lessor's consent. In conjunction with the lease, Union and Schanno also entered a yardage agreement in which Union agreed to maintain and clean 17 cattle holding pens in the stockyard for the use of Schanno. This yardage agreement is also assignable without the consent of Union.

On February 29, 1980, Schanno sold the packing plant to Williston Packing Company with only two amendments to the lease and yardage agreement: a modification in the formula for calculating additional rent, and a reduction in the number of cattle holding pens from 17 to 8. Williston assigned the lease and yardage agreement to Held Beef Industries, which in turn sold the packing plant to respondents B & H Investment Co.

and Federal Beef Processors, Inc. (Federal Beef) on September 1, 1987. Union consented in writing to this assignment later in September 1987. On August 10, 1988, Union entered a purchase agreement with Central Livestock Association, Inc. (Central) for the sale of a substantial part of the real estate on which the stockyards are located. However, Union retained title to the portion of the real estate which holds the cattle holding pens that are subject to the yardage agreement with Federal Beef.

Union is the lessor here; Federal Beef is the lessee. The lease requires Federal Beef to pay $900 annually in basic rent at a rate of $75 per month, plus additional rent for each animal "which is received directly at [Federal Beef's] plant * * * which was not immediately or shortly prior thereto purchased or handled at [Union's] stockyards."

Prior to Federal Beef's purchase of the processing plant, the prior owner, Held Beef, had been slaughtering approximately 300 cattle per day. The lease agreement defined "normal operation" of the packaging plant as "slaughtering and processing a daily average on a five (5) day week basis of not less than three hundred (300) head of livestock for such continuous period of operation." Of this 300 head, however, Held Beef initially purchased only 40% and eventually only 20% of the cattle from the Union Stockyard. The evidence further demonstrates that packaging plants in general were experiencing a decline of cattle supply from the stockyards.

In spite of this trend, Robert Goldberger, co-owner of Federal Beef, planned to increase production at the packaging plant and slaughter 600–700 cattle per day. He felt that because a stockyard generally supplies the meat packing plant, Federal Beef would be able to purchase at least 50% of its cattle from the Union Stockyard. Goldberger did not discuss those expectations with anyone from Union, however. He and his brother simply came to the conclusion that they could run their meat packing plant to capacity; they did not consult Union to discuss the viability of such a plan. From September

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1987 until October 1992, Federal Beef purchased approximately 34,308 cattle from Union Stockyard. This number constituted approximately 4.4% of the total number of cattle processed at the packing plant. Federal Beef then purchased the remainder of the cattle it needed for processing from farmers or cattle auctions.

Based on Federal Beef's demand for cattle and Union Stockyard's inability to meet that demand, Federal Beef purchased its cattle from other sources, stored some of it in the holding pens at the Union Stockyard, and paid the additional rent charges set out in the lease. Federal Beef's claim against Union Stockyard was based on the amount of money it spent purchasing cattle from other sources and the amount of additional rent it paid per head to store some of that cattle at the stockyard.

Federal Beef's next claim arises from Union Stockyard's sale of a portion of the stockyard to Central Livestock in 1988. Federal Beef contends that sale constituted the "closing" of Union's stockyard and activated Federal Beef's right to exercise its option to purchase the stockyard for cash.

After a ten-day trial, the jury returned a verdict in favor of respondents, finding their total damages to equal $1,531,933.92. The trial court later ordered prejudgment interest on the $285,682 verdict for additional rent paid and allowed Federal Beef to exercise its purchase option. Appellant moved for JNOV or, in the alternative, a new trial. The trial court denied this motion.

## ISSUES

1. Did the trial court err in submitting the implied contract claim to the jury and in upholding the jury's verdict upon motion for JNOV?

2. Did the trial court err in denying JNOV on the breach of contract claim?

3. Did the trial court err in denying JNOV on the claim to exercise the purchase option under the lease, and in concluding that

1. Clause 27 of the lease agreement provided, "This Agreement and the performance thereof shall be governed, interpreted, construed and

Federal Beef could validly exercise that purchase option?

## ANALYSIS

### *Standard of Review*

Judgment notwithstanding the verdict "may be granted only when evidence is so over-whelmingly on one side that reasonable minds cannot differ as to the proper outcome."

*Lamb v. Jordan,* 333 N.W.2d 852, 855 (Minn. 1983) (citations omitted). In applying this standard, the court must view all of the evidence in a light most favorable to the verdict; the court may not weigh the evidence or judge witness credibility. *Id.*

### 1. *Implied Contract Claim*

Union contends the trial court erred when it submitted the question of an implied contract to the jury. We agree. Our careful review of the record and briefs in this case leads to the inescapable conclusion that there were no issues to be submitted to the jury. A directed verdict should have been entered at the close of the evidence in favor of Union.

In North Dakota,[1] as in Minnesota, contract construction is a question of law for the court to decide. *Atlas Ready–Mix of Minot, Inc. v. White Properties, Inc.,* 306 N.W.2d 212, 217 (N.D.1981). General rules of contract construction apply to leases as well. *Agra–By–Products, Inc. v. Agway, Inc.,* 347 N.W.2d 142, 146 (N.D.1984). North Dakota's rules of statutory construction require the court to give the language of the contract full effect if the language is "clear and explicit and does not involve an absurdity." N.D.Cent.Code § 9–07–02 (1987).

The trial court determined that the lease provisions were ambiguous and admitted extrinsic evidence at trial for clarification. Whether the terms of the written contract were ambiguous is a question of law which we review de novo. *Agra–By–Products,* 347 N.W.2d at 149. We discern no ambiguity in

regulated by the laws of the State of North Dakota."

the language of the lease. The relevant sections provide:

5(b): *Additional Rent.* Lessee covenants and agrees to pay to Lessor during the term hereof as Additional Rent to Lessor for each animal * * * which is received directly at Lessee's plant on the Demised Premises and which was not immediately or shortly prior thereto purchased or handled at Lessor's Stock Yards in West Fargo, North Dakota, an amount determined pursuant to the following schedule of charges, said Additional Rent to be calculated and paid to Lessor weekly:

For the first 75,000 animals so received during each year beginning April 1st and ending March 31st (the "Base Year"), 56¢ per animal;

For next 75,000 animals so received during such Base Year, 28¢ per animal; and

For all animals in excess of 150,000 so received during such Base Year, 14¢ per animal.

$$* \quad * \quad * \quad * \quad * \quad *$$

5(d): *Cessation of Business of Lessor or Lessee.* Notwithstanding any other provision contained herein, if Lessor shall cease operations of its Stock Yards in West Fargo, North Dakota or failed to make adequate yardage services available to Lessee thereat such as to materially affect the business of Lessee, then for any such period Lessor shall fail to so conduct its business, Lessee shall not be required to pay Additional Rent or Minimum Additional Rent. For any Base Year in which Lessor shall fail to so conduct its business, the Minimal Additional Rent abated hereunder shall be directly proportional to the period in which Lessor fails to so conduct its business during said Base Year.

$$* \quad * \quad * \quad * \quad * \quad *$$

8(d): *Signs.* * * * [N]o sign shall be erected on the Demised Premises pertaining to the purchase of livestock without the consent of Lessor.

$$* \quad * \quad * \quad * \quad * \quad *$$

19(a): *Conditions of Default; Termination.* In the event any one or more of the following events shall have occurred and shall not have been remedied as hereinafter provided: (1) failure to operate the Demised Premises as a livestock slaughter and processing plant for a period of forty-eight (48) consecutive months (* * *; for purposes hereof, "normal operation" shall mean slaughtering and processing a daily average on a five (5) day week basis of not less than three hundred (300) head of livestock for such continuous period of operation).

$$* \quad * \quad * \quad * \quad * \quad *$$

25(a): *Purchase Option: Closing of Lessor's Stock Yards.* In the event that Lessor shall close its Stock Yards in West Fargo, North Dakota, for commercial purposes, other than on a temporary basis not to exceed sixty (60) days, Lessee shall have an option to purchase the Demised Premises for cash at the purchase price provided hereunder, which option shall be exercisable by giving Lessor written notice of Lessee's election thereof on or before sixty (60) days after the close of such Stock Yards or Lessee's receipt of written notice from Lessor of Lessor's written election to close such Stock Yards.

■ Contrary to Federal Beef's claims, this language does not create an implied obligation for Union to supply 50% of Federal Beef's cattle needs in the processing plant.

Union was a clearinghouse where producers brought their cattle for auction sale. Significant to our decision is the undisputed fact that Federal Beef had to take its chances at auctions conducted by Union. There was no guarantee by Union of any particular number of cattle to be furnished to Federal Beef, nor could there be where there was open bidding. Testimony at trial established that Union's stock fluctuated and its business depended solely on supply and demand. It would be inconsistent with this business practice for Union to obligate itself to supply a fixed amount of cattle to Federal Beef. The lease contains no mention of such a supplier-buyer relationship between Union and Federal Beef, nor does any provision obligate Union to supply a set 50% of Federal Beef's cattle needs. Indeed, Goldberger admitted at trial that Union had made no promises or representations regarding the

supply of cattle. He simply decided that Federal Beef would double production, and expected Union to supply 50% of the cattle. He made this decision in spite of negative market factors: the prior owner of the meat packaging plant had only purchased 20% of its cattle from Union and market indicators suggested a general decline in cattle supply from stockyards to meat packing plants.

We do not construe section 5(b), which addresses additional rent, to create a "penalty" against Federal Beef for purchasing cattle from outside producers. On the contrary, this provision contemplates that Union will not be able to supply enough cattle for the meat packaging plant; it sets out a fee schedule that decreases as the number of animals Federal Beef brings into the stockyard increases. This provision cannot be reasonably interpreted to imply that Union had a duty to supply 50% of the cattle for Federal Beef.

■ Furthermore, even if we were to determine that the lease was ambiguous and created an implied contract for supply of cattle, the contract would be invalid and unenforceable for lack of mutuality of obligation among the parties. *See Stewart Equip. Co. v. Hilling Constr. Co.*, 175 N.W.2d 692, 696 (N.D.1970) (mutuality of obligation is essential to valid contract). Even though Federal Beef seeks to create an *implied* duty for Union to supply cattle, Federal Beef acknowledges that *it* had *no* duty, expressed or implied, to purchase any cattle from Union. North Dakota does not recognize such a one-sided supplier obligation in a contract because "[b]oth parties must be bound, or neither is bound." *Id.*

■ Thus, the rights of the parties were fixed by the contract between them. Clause 30 of the lease agreement declares:

This Agreement constitutes and expresses the entire agreement and understanding between the parties hereto, in reference to all matters herein referred to and all previous discussions and representations and understandings relative hereto had between the parties hereto being merged herein, including but not limited to the Prior Leases.

In addition to that lease provision, North Dakota courts presume that the entire agreement of the parties is contained within a written contract, and thus will seek to determine the parties' intent from that writing alone if possible. N.D.Cent.Code § 9–07–04. Ascertaining the parties' intent from the written contract is also a question of law for the court to determine. *Lambott v. United Tribes Educ. Technical Ctr.*, 361 N.W.2d 590, 593 (N.D.1985). Under the plain language of the lease, Union agreed to provide holding pens and yardage services to Federal Beef. This language shows no intent to create a cattle supplier obligation on Union's behalf.

■ Absent any express provision in the contract, requiring appellant union to provide 50% of the cattle for respondent packing plant had no basis in fact and was not a term or condition of the contract. The verdict based on Union's implied obligation fails for lack of evidentiary support. A verdict may not stand on mere supposition. Federal Beef has not claimed fraud or misrepresentation. We consider here an unambiguous written contract, governed by the law of North Dakota. Federal Beef failed to meet its burden of proof and judgment notwithstanding the verdict is mandated in favor of Union.

### 2. *Breach of Contract Claim*

■ Union contends that the trial court erred by denying it JNOV on the breach of contract claim which was based upon section 5(d) of the lease. That section states:

If [Union] shall cease operations of its stockyards in West Fargo, North Dakota, or fail to make adequate yardage services available to [Federal Beef] thereat such as to materially affect the business of [Federal Beef], then for any such period [Union] shall fail to so conduct its business, [Federal Beef] shall not be required to pay additional rent or minimum additional rent.

Respondents contend that when Union Stockyard sold a portion of its property to Central Livestock, Union "ceased operation" and relieved Federal Beef of its obligation to pay additional rent under section 5(d). We cannot agree for several reasons.

The plain language of section 5(d) seeks to insure that the stockyard will be in operation to provide the yardage services necessary to support Federal Beef's business. We do not accept Federal Beef's narrow interpretation of section 5(d) that if Union does not run the stockyard itself, the stockyard "ceases operations." The stockyard continued to operate in spite of the sale of a major portion of property to Central Livestock. Indeed, Goldberger admitted at trial that the stockyard never closed. Nor did Union "fail to make adequate yardage services available." The trial court submitted this as a question on the special verdict, but offered no rationale in connection with this matter, notwithstanding clear evidence to the contrary. Union did not sell the portion of the stockyards that contained the seven holding pens that Federal Beef used. Furthermore, Union paid Central Livestock $1,500 per month to maintain the holding pens and provide yardage services. These facts cut against respondents' argument that Union had ceased its involvement in the stockyard. Moreover, this evidence demonstrates that Union remained active in the portion of the stockyard which directly affected Federal Beef. No breach occurred. The trial court erred in denying Union's motion for JNOV.

### 3. *Exercise of the Purchase Option*

■ Union contends that the trial court erred in submitting to the jury the issue of whether Federal Beef had the right to exercise its purchase option on the stockyard. We agree. We consider this issue related to the previous issue since it revolves around the sale of the stockyard. Section 25(a) of the lease afforded Federal Beef 60 days from notice of the "closing" of the stockyard to exercise its right to purchase the premises. The operative word here is "closing." The plain language of section 25(a) does not suggest that "closing" means sold or transferred ownership. Even if the sale of the stockyard

had constituted a "closing," however, Federal Beef missed its opportunity to exercise its right to purchase by waiting 125 days, with knowledge of the sale to Central, before exercising the option. The court erred in giving the question to the jury and in issuing a declaratory order which allowed Federal Beef to exercise its option to purchase the stockyard.

In light of our disposition in this case, we need not address respondents' issue, presented in their notice of review, regarding prejudgment interest on their damages award.

## DECISION

■ The trial court erred when it submitted issues of contract construction to the jury in this case. The written lease was an unambiguous, complete agreement of the parties. It left no room for parol evidence or extrinsic evidence regarding the meanings or implications of the terms of the lease. Union agreed to provide holding pens and yardage services to Federal Beef. The lease contains no basis for an implied obligation to supply Federal Beef with 50% of its cattle needs. The overwhelming evidence in the record demonstrates that there were no issues for the jury to determine. Reasonable minds cannot differ on the express, clear terms of this lease agreement. The trial court erred when it denied JNOV and directed the entry of judgment in favor of respondents. We reverse with directions to vacate the judgment and enter judgment notwithstanding the verdict in favor of Union.

**Reversed and remanded.**